AARON D. FORD
  Attorney General
HENRY H. KIM (Bar No. 14390)
  Deputy Attorney General
State of Nevada
Office of the Attorney General
555 East Washington Ave., #3900
Las Vegas, Nevada 89101
Phone: (702) 486-3095
Fax: (702) 486-3773
E-mail: hkim@ag.nv.gov

*Attorneys for Defendant Romeo Aranas*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| John Melnik,<br><br>        Plaintiff,<br><br>v.<br><br>Romeo Aranas,<br><br>        Defendant. | Case No. 2:17-cv-02378-JCM-GWF<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

 Defendant, Romeo Aranas (Dr. Aranas), by and through counsel, Aaron D. Ford, Nevada Attorney General, and Henry Kim, Deputy Attorney General, and hereby moves for summary disposition of this matter in their favor. This motion is made and based on Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), the following memorandum of points and authorities, all pleadings and papers on file, the attached exhibits, and any other evidence the Court deems appropriate to consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

 Plaintiff John Melnik is an inmate lawfully incarcerated in the Nevada Department of Corrections ("NDOC") and currently housed at High Desert State Prison (HDSP). On September 5, 2017, Melnik filed a Civil Rights Complaint (Complaint) pursuant to 42 U.S.C. Section 1983. (*See* ECF No. 1-1).

. . .

In its Screening Order dated July 2, 2018, this Court ordered that Melnik's Eighth Amendment claim for deliberate medical indifference to proceed against Dr. Aranas. (ECF No. 3 at 7:4-5).

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Factual Background

Melnik alleges that he was diagnosed with Hepatitis C virus (HCV) infection in 2006. ECF No. 4 at 5. In October of 2014, Food and Drg Administration (FDA) approved the use of Harvoni, the first ever Direct Acting Antiviral (DAA) released in the United States for treatment of HCV that does not require concomitant treatment with interferon. *See* Dr. David Hellerstein's Expert Witness Report, attached as **Exhibit 1**, at 3. On November 4, 2014, Melnik submitted a medical request regarding HCV treatment for the first time. *See* Melnik's Medical Records through December 12, 2018, attached as **Exhibit 2**, at 1.[1] On November 12, 2014, Melnik was seen and lab studies were ordered. Ex. 2 at 2. Lab studies revealed an Aspartate Aminotransferase Platelet Ratio Index (APRI) score of 1.24. Ex. 1 at 4.

On March 19, 2015, during a nursing visit for knee pain, Melnik asked about his eligibility for HCV treatment. Ex. 2 at 3. In April, Melnik was transferred to Ely State Prison. Ex. 1 at 4. On April 29, 2015, Dr. Koehn ordered a hepatitis panel. *Id*. On June 24, 2015, Dr. Koehn met with Melnik to discuss the results of the hepatitis panel. Ex. 2 at 4.

On June 8, 2015, Dr. Koehn ordered HCV genotype test, which confirmed HCV infection. *Id*. at 5; *see also* Ex. 1 at 4. Melnik was enrolled in the Chronic Disease Clinic for HCV infection. Ex. 2 at 5; *see also* Ex. 1 at 4. On June 24, 2015, Dr. Koehn met with Melnik to discuss HCV labs and answer Melnik's questions. Ex. 2 at 200. Melnik's APRI score on June 24, 2015, was 1.336. *Id*.

. . .

. . .

. . .

---

[1] Exhibit 2 is a collection of medical records used in this Motion. If necessary, the entire medical file of Melnik will be provided to this Court upon order.

On July 9, 2015, Dr. Koehn saw Melnik to discuss HCV labs. *Id.* at 5. On July 26, 2015, Melnik submitted a medical request for Harvoni treatment for his HCV infection. *Id.* at 334. He was submitted for potential treatment. *Id.*

In September of 2015, Melnik's APRI score improved slightly to 1.44, based on lab studies taken in September and an estimate of his platelet count. Ex. 1 at 4. However, in November of 2015, Melnik's APRI score rose to 1.97. *Id.* Ex. 2 at 6. On November 24, 2015, Dr. Koehn ordered Melnik to be referred to the Hepatitis C committee (the Committee) to be approved for treatment. *Id.*

On March 30, 2016, Melnik's APRI score was 2.068. *Id.* at 196. Dr. Koehn referred Melnik to the Committee. *Id.* at 8.

On August 3, 2016, Melnik submitted a medical request stating that his APRI score was 2.074 and that he is eligible for HCV treatment. *Id.* at 9. Gloria Carpenter, Director of Nursing Services, responded to his request that Melnik is still on the list to be seen and that another provider is coming in the following week. *Id.* However, in September of 2016, Melnik's APRI score fell to 1.68. Ex. 1 at 5.

On October 13, 2016, HCV advanced practice nurse saw Melnik in HCV clinic nothing his request for treatment. Ex. 2 at 10. He documents Melnik's HCV control as "fair," and again refers him to the Committee. *Id.*

On November 28, 2016, Melnik submitted a medical request stating that his liver feels like it was swollen. *Id.* at 11. A provider ordered liver function tests and an ultrasound. *Id.* Dr. Hellerstein opined that Melnik's APRI score likely remained less than 2, based on the liver function test results in November and his platelet count taken several months later. Ex. 1 at 6.

On December 15, 2016, ultrasound of the abdomen was performed on Melnik. Ex. 2 at 12. Dr. Robert Leckie, who performed the examination, found an enlarged liver and spleen, the latter "possibly from mild elevation of the portal venous pressure secondary to cirrhosis." *Id.*

. . .

On January 2, 2017, Melnik submitted a medical request asking if he has been approved for HCV treatment. *Id*. at 13. A Registered Nurse responded that the 2017 Committee has not been formed and that she will inform Melnik when she receives more information. *Id*.

On February 9, 2017, Melnik submitted a medical request asking if he has been approved for Harvoni treatment. *Id*. at 14. A Registered Nurse responded that the Committee was emailed to check on the status of his request for treatment and that Melnik is enrolled in Chronic Disease Clinic to check on his APRI score . *Id*.

On March 9, 2017, Melnik's APRI score was 2.09. *Id*. at 6. Melnik is informed that his blood work will be sent to the new Committee for review. *Id*. On April 11, 2017, Melnik was seen at Chronic Disease Clinic and HCV lab studies were completed. *Id*. at 15. On the same day, HCV patient data form was submitted to the Committee for review. *Id*.

On May 9, 2017, Melnik was approved for HCV treatment. *Id*. On June 21, 2017, Melnik was seen for the initial HCV treatment. *Id*. Melnik received Harvoni once daily for twelve weeks. *Id*. at 16; Ex. 1 at 7. As of August of 2017, Melnik's liver functions are normal and his APRI was down to 0.49. Ex. 1 at 7. On September 28, 2017, HCV treatment on Melnik was completed. Ex. 2 at 17. As of November of 2017, HCV remained undetectable, Melnik's liver function tests remained normal, and his APRI score was 0.38. Ex. 1 at 7. In March of 2018, HCV was still undetectable, Melnik's liver function tests were normal, and his APRI score was 0.38. *Id*.

## B.   NDOC's HCV Treatment Policy (Medical Directive 219)

Consistent with the standard of practice at the time, NDOC policy on HCV treatment has prioritized treatment for HCV for patients whose lab tests suggested a high likelihood of developing serious liver damage, such as advanced fibrosis or cirrhosis. Ex. 1 at 8.

NDOC mainly used the APRI score, a measure based on blood tests, to monitor HCV patients. *Id*. An APRI score does not diagnose cirrhosis or advanced fibrosis. *Id*. Rather, an APRI score is used to identify when disease progression to permanent liver damage is likely. *Id*. at 9. NDOC required that a patient's APRI score to exceed 2.00 to be approved

for treatment, a lower threshold of 1.5 if other evidence of advanced fibrosis or cirrhosis is present. *Id*.; *see also* NDOC Medical Directive 2015 effective as of September 2015, attached as **Exhibit 3**, at 1. The Federal Bureau of Prisons and several other state correctional systems at that time were using similar measures to prioritize treatment. Ex. 1 at 9. In fact, the Federal Bureau of Prisons still use APRI score of 2.00 to monitor progression of HCV infection. *See* Federal Bureau of Prisons Clinical Practice Guidelines effective as of January 2018, attached as **Exhibit 4**, at 10.

## III.   LEGAL STANDARD

### A.   Summary Judgment Under Fed. R. Civ. P. 56

Pursuant to FRCP 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

. . .

If the party seeking summary judgment meets its burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979). Conclusory or speculative testimony is insufficient to raise a genuine issue of fact and defeat summary judgment. *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) (ruling that a conclusory and speculative affidavit did not defeat summary judgment because it "failed to set forth any specific facts within [the declarant's] personal knowledge"). An affidavit or declaration will not defeat summary judgment if it contains no more than conjecture or a scintilla of evidence insufficient to support a jury verdict. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). "A non-movant's bald assertions or a mere scintilla of evidence are both insufficient to withstand summary judgment." *FTC v. Stephanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (citing *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir.2007)).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See S.E.C. v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir. 1982); *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.*, 368 U.S. 464, 473 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted if all reasonable inferences defeat the respondent's claims. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir. 1982).

. . .

1

## IV.   ARGUMENT

### A.   There is no Genuine Issue of Material Fact that Dr. Aranas was not Deliberately Indifferent to Melnik's Medical Needs

To establish a constitutional violation, an inmate must satisfy a two-part test: (1) that he has a "serious medical need" and "failure to treat [his] condition could result in further significant injury or the 'unnecessary and wanton infliction of pain';" and (2) the defendants' response to the medical need was deliberately indifferent." *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006). To determine whether the defendants' response was deliberately indifferent, an inmate must show the following: (1) the defendants' purposefully acted or failed to respond to the inmate's possible medical need; and (2) the indifference caused harm. *Id.* Notably, the officials' conduct must demonstrate "unnecessary and wanton infliction of pain" before it violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Deliberate indifference is a high legal standard; a medical professional's mistake, negligence, or malpractice is not sufficient to constitute deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Every claim by an inmate that he has not received adequate medical treatment does not constitute an Eighth Amendment violation. *Estelle*, 429 U.S. at 105. An inmate alleging deliberate indifference to serious medical need "must allege acts or omissions sufficiently harmful" to the inmate. *Id.* at 106.

Dr. Aranas was not deliberately indifferent to Melnik's medical needs, because he did not purposefully fail to respond to Melnik's medical need. Although there was some delay between Melnik's initial request for treatment and when Melnik actually received treatment, there is no evidence suggesting that Dr. Aranas knew but purposefully failed to respond to the inmate's possible medical needs.

Concededly, there may have been some delay between when Melnik first became qualified for priority treatment and when he was approved for treatment. Melnik's APRI score exceeded 2.0 for the first time in March of 2016, making him eligible for prioritized treatment. Ex. 2 at 8. Melnik was not approved for treatment until May 9, 2017. *Id.* at 6.

However, nothing in the record suggests that Dr. Aranas knew of Melnik's prior requests for treatment or intentionally caused any delay in approving Melnik for treatment. First, Dr. Aranas does not respond to medical requests. *See* Dr. Aranas' responses to Plaintiff's First Interrogatories, attached as **Exhibit 5**, at 4. Indeed, there is nothing in the record that shows Dr. Aranas was aware of Melnik's APRI score prior to November 21, 2016, when Dr. Aranas responded to Melnik's second level grievance regarding HCV treatment. *See* Inmate Grievance #20063020432, attached as **Exhibit 6**, at 1. Dr. Aranas upheld Melnik's grievance, stating that Melnik will be seen "very soon" regarding his request for HCV treatment. *Id*. at 2.

It appears that any delay in approving Melnik for treatment was caused by other reasons.  One of those reasons is the evolution of HCV treatment during the relevant time period. Indeed, Dr. Aranas stated that HCV treatment evolved during the relevant time period, in that DAA became available for treatment, which may have been the cause of delay in treatment. Ex. 5 at 6. Treatments for HCV in 2015 and before were interferon and ribavirin with success rate of mere 33%. Ex. 5 at 8.

In addition, Melnik's fluctuating APRI score also was the reason for the delay in approving Melnik for treatment. Between March of 2016 and the beginning of his treatment in June of 2016, Melnik's APRI score hovered around the 2.0 threshold, rising as high as 2.09 and dropping as low as 1.68. Ex. 1 at 9. Because the APRI score is used to identify when disease progression to permanent liver damage is likely, improvements in Melnik's APRI score suggested against disease progression and therefore need to provide him Harvoni treatment.

Absent from the records is evidence showing that Dr. Aranas knew and intentionally failed to respond to Melnik's requests for treatment, which is required to demonstrate that Dr. Aranas was deliberately indifferent to Melnik's medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Admittedly, there was some delay between when Melnik first became qualified and when the Committee approved him for Harvoni treatment. However, such delay was caused by the evolution of HCV treatment during the relevant time period and

negligence on the part of HDSP medical staff at best. However, medical professionals' negligence does not constitute deliberate medical indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004); *see also Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (holding that deliberate medical indifference does not include "mere negligence in diagnosing or treating a medical condition"). There is no genuine issue of material fact that Melnik was eventually approved for HCV treatment and was cured. Ex. 2 at 15-16; Ex. 1 at 7. Without any evidence showing that Dr. Aranas intentionally failed to respond to Melnik's requests for HCV treatment, Melnik cannot establish an Eighth Amendment claim for deliberate medical indifference and Dr. Aranas is entitled to summary judgment.

**B. There is no Genuine Issue of Material Fact that Melnik Cannot Establish he Suffered Further Injury due to Delay in Treatment**

Even if this Court finds that Dr. Aranas purposefully failed to respond to Melnik's requests for Harvoni treatment, Melnik cannot establish that he suffered further injury due to delay in approving Harvoni treatment and cannot prove the extent of such injury, if any.

To determine whether the defendants' response was deliberately indifferent, an inmate must show the following: (1) the defendants' purposefully acted or failed to respond to the inmate's possible medical need; and (2) the indifference caused harm. *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006). As to the second prong of this *Penner* test, the Ninth Circuit has held that the "**mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference**." *Colwell v. Bannister*, 763 F.3d 1060, 1081 (9th Cir. 2014); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (emphasis added); *see also Colwell*, 763 F.3d at 1081; *Crozier v. Endel*, No. 3:09-CV-00694-LRH, 2012 WL 688464, at *8 (D. Nev. Jan. 23, 2012).

Federal Rules of Evidence ("FRE") 701(c) provides that a lay witness may not offer a testimony in the form of an opinion that is based on scientific, technical, or other specialized knowledge within the scope of FRE 702. Only a qualified expert witness with knowledge, skill, experience, training, or education may offer an opinion based on scientific, technical,

or other specialized knowledge. *See* FED. R. EVID. 702. Causation is a hypothetical question designated for expert witnesses. *See United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011); *see also Wilson v. Biomat USA, Inc.*, No. 2:10-CV-1657-GMN-RJJ, 2011 WL 4916550, at *1–2 (D. Nev. Oct. 17, 2011). "Because Plaintiffs bear the ultimate burden of proof on causation, [defendant] had only to point to the absence of a genuine issue of material fact; it wasn't required to produce any evidence at all." *Daubert v. Merrell Dow Pharm.*, Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (citing *Maffei v. Northern Insurance of New York*, 12 F.3d 892, 899 (9th Cir. 1993)).

In his Complaint, Melnik claims that he suffers from cirrhosis of the liver because Dr. Aranas denied his request for Harvoni treatment. ECF No. 4 at 7. However, there is no affirmative evidence that Melnik actually has cirrhosis of the liver. Indeed, Dr. David Hellerstein, defense expert witness, opined that whether the delay in approving Melnik's request for treatment resulted in permanent damage to Melnik's liver is doubtful. Ex. 1 at 9. Specifically, Dr. Hellerstein stated that it typically takes 20 to 30 years, sometimes more, for cirrhosis to develop in the one third of HCV infected patients who ultimately do get cirrhosis. *Id*. Dr. Marshall Anthony, Melnik's expert witness, agrees that cirrhosis develops over 25-30 year period, not over fifteen (15) months. *See* Dr. Marshall Anthony's Expert Witness Report, attached as **Exhibit 7**, at 8. Dr. Hellerstein opined that, because fifteen (15) months between when Melnik's APRI score exceeded 2.0 for the first time and when he was approved for treatment is only 4% to 6% of that time window, so it is doubtful that those fifteen (15) months resulted in permanent damage to Melnik's liver. *Id*.

Melnik relies on ultrasound reports from December 15, 2016 and May 30, 2017 to argue that he has cirrhosis. ECF No. 4 at 7. Dr. Anthony similarly relies on the same ultrasound reports as well as an increase in Melnik's APRI score to argue that Melnik has cirrhosis as a result of the alleged delay in approving treatment. *See* Ex. 7 at 10.  Melnik's ultrasound report in December of 2016 described a mildly enlarged spleen "**possibly** from mild elevation of the portal venous pressure secondary to cirrhosis." Ex. 2 at 12. Ultrasound reports in May of 2017 and February of 2018 revealed coarsened liver texture/echogenicity.

However, "liver echogenicity [texture] . . . cannot be relied upon in diagnosing fibrosis, not even cirrhosis . . ." Ex. 1 at 10. Dr. Hellerstein found that Melnik's claim of having cirrhosis is based upon flawed interpretation of two ultrasound reports. *Id.*

"Cirrhosis of the liver is diagnosed by biopsy or by non-invasive measures of liver elasticity, unless cirrhosis has advanced to the point where esophageal varices, ascites, or other signs of liver decompensation make the diagnosis obvious." *Id.* Dr. Anthony does not opine that Melnik has other advanced signs of cirrhosis such as varices or ascites. To simply put, Melnik's medical records do not conclusively support a diagnosis of cirrhosis. Ex. 2 at 11.

In fact, Dr. Hellerstein opined that there is actually evidence suggesting that Melnik does not have cirrhosis of the liver. *See* Dr. David Hellerstein's rebuttal expert report, attached as **Exhibit 8**, at 1. Dr. Hellerstein opined that Melnik does not have cirrhosis based on the evidence that HCV is no longer detectable in Melnik's bloodstream, laboratory evidence of a chronic inflammatory reaction in his liver is no longer present, and his APRI score is less than 0.5. *Id.* According to UpToDate, the online website referenced in Dr. Anthony's report, interprets an APRI score of less than 0.5 to mean cirrhosis is unlikely. *Id.* APRI score is useful, when it is low, for excluding advanced fibrosis or cirrhosis. *Id.* at 2. Specifically, more than 80% of HCV patients with an APRI score of 0.5 or lower do not have significant fibrosis or cirrhosis. *Id.* Melnik's last APRI scores taken six weeks and six months after successful Harvoni treatment were 0.38 and 0.46 respectively. *Id.* Absent other clinical evidence to the contrary, which Melnik has none, it is unlikely that Melnik has significant fibrosis or cirrhosis. *Id.*

Even assuming, arguendo, that Melnik has advanced fibrosis or cirrhosis, Melnik's claim for damages would be speculative because Dr. Anthony could not and cannot opine as to the extent of irreparable liver damage, if any, arising from the alleged delay in HCV treatment. Ex. 7 at 10 ("I cannot comment on the extent of the irreparable liver damage"). Melnik has not disclosed any other evidence or expert witness to prove the extent of his damages. Absent proof of damages, summary judgment in favor of Dr. Aranas is

appropriate as Melnik's proof of damages is speculative. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (district court excluded expert witness report due to flaws in analysis and then granted summary judgment because there was no evidence left of damages); *D.A. Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1452 (9th Cir. 1983) (plaintiff neither identified expert witness nor designated documents supporting damages claim)); *see also City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) (sole evidence of damages was expert study that failed to segregate losses, if any, caused by acts which were not antitrust violations from those that were)). Similar to *D.A. Rickards*, Melnik neither identified expert witness nor designated documents supporting his claim for damages. Therefore, this Court should find that Melnik's claim for damages is speculative and grant summary judgment in favor of Dr. Aranas.

## C.    Alternatively, Dr. Aranas is Entitled to Qualified Immunity

In addition to being entitled to summary judgment based on the lack of any genuine issue of material fact, Defendants are also entitled to summary judgment in this case under the doctrine of qualified immunity.

Whether governmental employees are entitled to qualified immunity is a question of law subject to *de novo* review before this Court. *Devereaux v. Perez*, 218 F.3d 1045, 1051 (9th Cir. 2000) (citing *Elder v. Holloway,* 510 U.S. 510, 516 (1994); *Thompson v. Mahre,* 110 F.3d 716, 721 (9th Cir. 1997)). Like summary judgment motions, "[t]his court must assume the relevant facts in the light most favorable to the Plaintiff, and then determine whether the defendants are nonetheless entitled to qualified immunity as a matter of law." *Devereaux,* 218 F.3d at 1051 (citing *Moran v. Washington*, 147 F.3d 839, 944 (9th Cir. 1998)).

> The Plaintiff bears the burden of demonstrating that the underlying right was clearly established at the time of the alleged misconduct. If the Plaintiff meets this burden then the officials must prove that "their conduct was reasonable under the applicable standards even though it might have violated the Plaintiff's constitutional rights."

. . .

1  *Devereaux, supra* (citing *Romero v. Kitsay Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) and

2  *Benigni v. City of Hemt*, 879 F.2d 473, 480 (9th Cir. 1998)).

3          It is a long-standing principle that governmental officials are shielded from civil

4  liability under the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818

5  (1992).

6          The defense of qualified immunity protects "government officials
           . . . from liability for civil damages insofar as their conduct does
7          not violate clearly established statutory or constitutional rights

8          of which a reasonable person would have known." The rule of
           qualified immunity "'provides ample support to all but the
9          plainly incompetent or those who knowingly violate the law.'"
           "Therefore, *regardless of whether the constitutional violation*
10         *occurred,* the officer should prevail if the right asserted by the
           Plaintiff was not 'clearly established' or the officer could have
11         reasonably believed that his particular conduct was lawful."
           Furthermore, "[t]he entitlement is an immunity from suit rather
12         than a mere defense to liability; . . . it is effectively lost if a case
           is erroneously permitted to go to trial."

13

14  *Schroeder v. McDonald*, 55 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Robinson v. York*, 566

15  F.3d 817, 821 (9th Cir. 2009).

16          When conducting the qualified immunity analysis, courts "ask (1) whether the

17  official violated a constitutional right and (2) whether the constitutional right was clearly

18  established." *C.B. v. City of Sonora*, 760 F.3d 1005, 1022 (9th Cir. 2015) (citing *Pearson v.*

19  *Callahan*, 555 U.S. 223, 232, 236 (2009)).

20          The second inquiry, whether the constitutional right in question was clearly

21  established, is an objective inquiry that turns on whether a reasonable official in the

22  position of the defendant knew or should have known at the time of the events in question

23  that his or her conduct was constitutionally infirm. *Anderson v. Creighton*, 483 U.S. 635,

24  639-40 (1987); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 915 (9th Cir. 2012). Only where a

25  governmental official's belief as to the constitutionality of his or her conduct is "plainly

26  incompetent" is qualified immunity unavailable. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per

27  curiam). Governmental officials are entitled to high deference when making this

28  determination, *Anderson*, 483 U.S. at 640, requiring the Court to assess whether qualified

1    immunity is appropriate "'in light of the specific context of the case.'" *Tarabochia v. Adkins*,

2    766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir.

3    2009)).

4         In determining "'whether a [constitutional] right was clearly established,'" this Court

5    is to survey the law within this Circuit and under Supreme Court precedent "'at the time

6    of the alleged act.'" *Perez v. United States*, 103 F. Supp. 3d 1180, 1208 (S.D. Cal. 2015)

7    (quoting *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (2010); citing *Bryan v.

8    MacPherson*, 630 F.3d 805, 933 (9th Cir. 2010). Only in situations where there is no

9    precedent regarding the qualified immunity question at issue should this Court look to

10   "other circuits and district courts to ascertain whether the law is clearly established." *Cmty.

11   House*, 623 F.3d at 967 (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)).

12        On January 9, 2017, the Supreme Court unanimously reiterated what is meant by

13   clearly established. There, in the case of *White v. Pauly*, 137 S.Ct. 548 (2017) (per curiam)

14   (2017), the Court instructed as follows:

15              Today, it is again necessary to reiterate the longstanding
                principle that "clearly established law" should not be defined "at
16              a high level of generality." As this Court explained decades ago,
                the clearly established law must be "particularized" to the facts
17              of the case. Otherwise, "[p]laintiffs would be able to

18              convert the rule of qualified immunity . . . into a rule of virtually
                unqualified liability simply by alleging violation of extremely
19              abstract rights."

20              The panel majority misunderstood the "clearly established"
                analysis: It failed to identify a case where [the government
21              officials] acting under similar circumstances . . . [were] held to
                have violated the [Constitution]. [*White*, 137 S.Ct. at 551-52].
22

23   The Ninth Circuit had the opportunity to further explain the dictates of *White* in its May

24   12, 2017 decision in *S.B. v. County of San Diego*, 864 F.3d. 1010 (9th Cir. 2017). There, the

25   Ninth Circuit "acknowledge[d] the Supreme Court's recent frustration with failures to heed

26   its holdings," and that the Court had "'repeatedly told courts—and the Ninth Circuit in

27   particular—not to define clearly established law at a high level of generality.'" *Id*. at 1015.

28   The *S.B.* court then acknowledged that it heard the Supreme Court "loud and clear," and

noted that "[b]efore a court can impose liability on [a government employee, it] must identify precedent as of the date" of the alleged constitutional deprivation, "that would put [the government employee] on clear notice that" the individual's action "in [this] particular circumstance[] would" violate the constitution. *Id.*

The burden of proving whether the particular right in question was clearly established rests with the non-governmental party. *Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009), *vacated in part on other grounds*, 661 F.3d 1201 (9th Cir. 2011) (citing *Galen v. Cty. of L.A.*, 477 F.3d 652, 655 (9th Cir. 2007)); *see also Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006).

With regard to the first prong, i.e., whether a constitutional right existed, for the reasons noted above, Dr. Aranas maintains that he did not violate Melnik's constitutional right. There is no genuine issue of material fact that Melnik was eventually approved for HCV treatment and was cured. Ex. 2 at 15-16; Ex. 1 at 7. In addition, there is no evidence in the records suggesting that Dr. Aranas purposefully failed to respond to Melnik's requests for treatment, which is required to demonstrate that Dr. Aranas was deliberately indifferent to Melnik's medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

In addition, Dr. Aranas is entitled to qualified immunity because it was not clearly established that Dr. Aranas was acting in violation of Melnik's constitutional rights. Given the particularized facts and circumstances of this case, it was not clearly established that Dr. Aranas could be liable for the purported delay in approving treatment, especially when Melnik was eventually approved for treatment and was cured of HCV infection. Dr. Aranas acted in good faith and approved Melnik for treatment. Because there was no constitutional violation and it was not clearly established that Dr. Aranas could be liable for the purported delay, Dr. Aranas is entitled to qualified immunity.

. . .

. . .

. . .

. . .

1  **V.  CONCLUSION**

2       For the foregoing reasons, Defendants respectfully request that this Court grant

3  summary judgment in favor of Defendants as to Plaintiff's Eighth Amendment claim for

4  deliberate indifference to serious medical needs. Viewing the facts and circumstances in

5  light most favorable to Melnik, there is no genuine issue of material fact that Dr. Aranas

6  was not deliberately indifferent to Melnik's medical needs. Further, there is no genuine

7  issue of material fact that Melnik did not suffer further injury and/or the extent of such

8  further injury. Additionally, Defendants are entitled to qualified immunity as no

9  constitutional violation occurred and Defendants acted in good faith and believed their

10  actions were constitutional.

11       DATED this 10th day of June, 2019.

12                         AARON D. FORD
                         Attorney General

13

14                    By:  /s/ *Henry H. Kim*

15                         Henry H. Kim (Bar No. 14390)
                        Deputy Attorney General

16                         *Attorneys for Defendant Romeo Aranas*

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on June 10, 2019, I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**, by causing a true and correct copy thereof to be filed with the Clerk of the Court, using the electronic filing system to the following:

Travis N. Barrick, Esq.
Gallian Welker & Beckstrom
540 E. St. Louis Ave
Las Vegas, NV 89104
*Attorneys for Plaintiff*

/s/ *Diane Resch*
Diane Resch, an employee of the
Office of the Nevada Attorney General